So I know we've got seasoned attorneys here but I'll just quickly go over the rules. Please recall the light system that we have. The green light says you can keep talking, though you don't have to. The yellow light is two minutes left and the red light cut it off, although if we're still questioning you, you don't get to run away. We can keep questioning you. Please make sure and give us record sites when you're talking about something that happened in the record and please recall that rebuttal is for rebuttal only and not to bring up new topics. And with that, let's get started with United States v. Glenn, case number 18-10580. And we have Mr. Saputo. Thank you, Your Honors. Good morning. I'm going to start with a little bit of background about some of the topics I'm talking about that I couldn't really go into in the brief but that is contained in the record and I think that will help elucidate the arguments that I am going to make. I'm going to address them in the same order that I did in the brief. So the first thing I want to start out with is this idea of DFRAG and the master file table. This is the critical piece that was not disclosed to us. In count one of the first indictment, transportation of child pornography, that image was apparently located in the unallocated file space and this is explained in the brief. This is the image that was uploaded to or from ChatStep? Yes, it was uploaded from the IP address to ChatStep. This was found in the unallocated file space. The unallocated file space, to put it simply, is you delete something from your computer and then you hit empty trash, more or less is how that works. It ends up in this list of files that can be called the master file table. So that's what we're talking about there. The second group of images from the counts two through, I believe, nine in the indictment having to do with access and intent to view, those were found in the thumb cache, which is separate from the unallocated file space. It's allocated file space but it's automatically created by the operating system, in this case, Windows. Now, the reason why that's critical... Just so we understand, the count one is the ChatStep image? That's correct. The photograph of the prepubescent male. The count two are the thumb cache images? That's correct. And the reason why this is critical is based on what the government put in its own brief. Thumb cache images are created when a file is accessed or when the file system viewer creates a thumbnail of it. So if you're in Windows and you hit, you know, I want to see the thumbnails of all the images that are contained in this one folder, Windows will create these little thumbnail sized images and those little It's kind of odd, then, that the image that's in the unallocated file space is not contained in the thumb cache and vice versa. In other words, what was found in the unallocated... Is there any evidence that this could have accidentally ended up on the computer? That he never tried to access any of the child porn and it just, out of space, comes into his computer. Is there any evidence of that? There's not evidence of that. However, there is evidence that the FBI put it on this computer. Sorry, put what on his computer? Put these images on his computer. Where's the evidence of that in the record? Our expert testified that there was a CD, a USB CD drive that was inserted and unaccounted for at the time that the FBI agents admitted to being the person that inserted that thumb drive. What is, are you talking about the, what the agents did when they see that the FBI agents admitted to being the person that inserted that thumb drive? There was a, there was a unknown device that was inserted, an optical device that was inserted into the appellant's computer at the time the search warrant was being executed. None of the FBI agents admitted to being the person that inserted that thumb drive. What is, are you talking about the, what the agents did when they seized the computer to do the initial triage of the computer? No, so I'll pull up the specific citation for you. While you're doing that, you think about this. Is there any evidence that the four images or however many images in the thumb cache, which are the subject of count two? No. However, it's still important and I can explain why. Okay. And I'll answer your question first, I'll come back to this USB drive that was inserted. Well, you said no. Okay, so to answer your question specifically, because these images were in the thumb cache but not in unallocated file space, it's, it's a problem. So we'll call it an anomaly. How did that happen? Okay. If the images had existed on his computer, in other words, had he actually accessed those images, there should be somewhere in the unallocated file space. They should have been deleted. Okay. And the fact that the Windows Update installed overwrote any possible data, overwrote the remnants of that image. Okay. If the image ever existed. So what it is, what it shows is that there was a, the FBI destroyed any possible... But the Windows Update was his doing. I mean, this happens all the time. You say, you know, there's an update, do you want to do, and you go, well, later at night or whatever like that. You turn off your computer, then the next time you turn it on, it's going to do the update. Absolutely. And that's the evidence here. That's what happened. So this isn't some nefarious deed, this is just life in Windows. Well, I would argue that it was a nefarious deed. Okay. And the reason we know it was a nefarious deed is because... Did the district court find that a lack of bad faith on the part of the government agent? There were no specific findings made. No findings whatsoever. And so my understanding of the law in this case is the court is entitled to look in the entire record. I'm going to get back to the CD player. So this is... But what was Mr. Glenn and the FBI being the recipient of that, if you will, when they turned it on? As my expert explained, the way that the forensic examiner examined the hard drive, there was no... There was a complete lack of protocol. I mean, it didn't go... He didn't do it right. He simply didn't do it right. And even if he hadn't done it right, disclosure would have been appropriate. So in other words, if you make a mistake, you screw it up, you got to disclose it. It's that simple. And the fact that it wasn't disclosed is what's mission-critical here. By not disclosing it, you mean his 302 report was filed late? There were still issues that weren't disclosed. For instance, D-FRAG. The fact that D-FRAG was one is... And altered the master file table, which he admitted. Is there any evidence that D-FRAG affected the images on the thumb cache that are the subject of count two? That D-FRAG affected the images on the thumb cache? D-FRAG would have affected the unallocated space, so they would not have affected the thumb cache. So no. So no. In your understanding, how do images end up on the thumb cache of a computer? Either by directly accessing the file or by... Or by Windows automatically creating the file when you have a system view. So when you open a folder and you... In other words, if you have a folder... And this is another critical issue. If you have a folder and you open it, you don't see every file in that folder. You might only see the top five folders. But Windows is automatically going to create a thumbnail for all of the files that are in that image. Doesn't it suggest strongly that the user of the computer looked at the images and that's why they're in the thumb cache? No. Because the unallocated... Those images were not in the unallocated file space. They didn't exist in his computer. So how could a thumbnail be created if the image was never in unallocated file space? There's no evidence this image was ever in an allocated or in unallocated file space. So it's an anomaly. How does it end up one place without ending up in the other? And vice versa. How does an unallocated file space or an image in the unallocated file space not have a thumb cache image associated with it if he allegedly accessed it? If he accessed it, there should have been something in the unallocated file space. And I got to point this out, just so you're aware. This is a nine... The record in page 952 talks about the drive that was inserted and that's unaccounted for. And the reason why this is really important... This is the bloody rag of digital forensics. Metadata and file attributes is the bloody rag. If the police say you murdered somebody and here's the bloody rag we have to prove it, you're going to want to see the DNA. And what the government did in this case is it not only did not tell us about the DNA that was on that rag that didn't match... And why didn't it match? Because the... This is what I just explained. The thumb cache images were not found in unallocated and the unallocated images were not in the file space. And because they did not tell us about that, they then destroyed the evidence that could... That potentially could have shown... Well, not potentially, that would have actually shown where this image came from. Where did it come from? And by sheer coincidence, and this is what the government would have you believe, is that by sheer coincidence the one place that would have been able to tell us this, the master file table, was altered by the government while the computer was in the government's control. And so you say, fine, it's a mistake. Well then why wasn't it ever disclosed? When you say altered by the government while it was in the government control, what you really mean to say is that a Windows update started running while the government had the computer. A Windows update that was initiated by Mr. Glenn. No, Your Honor. No? No. I'm talking about the D-FRAG. The D-FRAG is the critical piece here. The D-FRAG doesn't have anything to do with the Windows update? Doesn't have anything to do with the Windows update. D-FRAG was allowed to run. D-FRAG never should have been allowed to run. There is, there should have been a write block that our witness, our expert talked about. There should have been a write block that was instituted. This is, the computer was allowed to connect to the Internet. Let me ask this. Long before there were computers, there were claims that evidence was planted. And the way that works is the police officer testifies, I found the drugs in the trunk, and somebody says, no, there weren't any drugs in the trunk. Even the defendant testifies, or a friend, or whoever, and then juries have to resolve that. What is different about this that would have us saying, as a matter of law, you're right? I mean, that's what you're kind of having to show, because all these facts are out there. A jury can sort through that. The jury could believe what you're saying, that the FBI planted it and all of that, and they could have acquitted him. It comes down to disclosure, Your Honor. What my understanding of prosecutorial misconduct, and what it takes to reverse or to send a case back, is that, is not whether or not a jury would have found differently, or could have found differently. The question is whether or not it was a fair trial. And in this particular case, the fact that D-FRAG was allowed to run, and we had no idea that that happened, that the one thing that could have shown how this anomaly could be explained, the fact that that was not disclosed, and he knew, Mr. Lehman knew that this was a critical piece of information, and never disclosed it. Are you in the process of making a Brady argument or a Youngblood argument, as you're talking to us right now? I haven't gotten to Youngblood yet, but... Okay, so you're making a Brady argument. This is still a Brady. You're making a Brady argument, so materiality is the third prong of a Brady argument. Right. Reasonable probability that it would have had a different impact, a different different result of the proceeding, reasonable probability. I thought you told me that the D-FRAG and the update didn't affect the images on the thumb cache. They didn't affect the images, but what... So they're there on his computer. They exist in the thumb cache, but not in any other allocated or unallocated file space. So what the D-FRAG would have done, or what the D-FRAG did by altering the master file table, is took away the only link we had to explain how was it possible they could have ended up on the thumb cache without ending up in the image, the Chat Step image. Didn't Mr. Glenn sign the back of the image? He signed it, but he didn't say, this is an image that I uploaded. Did he admit to uploading images of child pornography from Chat Step? He did, however, not that particular image. Then he signed the image. Your Honor, he was indicted for uploading specific images, and this was something that's extremely important. He wasn't indicted generally for child pornography. He wasn't indicted for child pornography. It was not a confession. What it says, read it closely, it says, if I uploaded this, then I must have seen this image. That's what it said. And wrongful convictions come out of exactly situations like this, where you have an ambiguous confession. They show him the image. They say... Well, there again, that's something a jury can construe. I mean, if someone accused me of looking at child porn, I can't imagine saying, well, if I this, if I that. I would say, no way, plain and simple. A jury can construe that. They could conclude what you said, okay, that this was just like a lawyerly response by Mr. Glenn, or they could say, uh-uh, that isn't what somebody says, who didn't look at it. I agree, Your Honor. That's a trial court issue. But what isn't a trial court issue is the government's responsibility to disclose to the defense... Okay, but you knew all this before the trial. Not all of it. You moved to dismiss the indictment on these grounds. We, we did not have the DFRAG. We did not know about DFRAG. DFRAG was never mentioned until the middle of trial. We, if you look through the expert's report, the DFRAG was never mentioned. The master... And this was critical, because this shows how this anomaly could have happened. This isn't a simple mistake. This is something that the government knew was a major issue. Was the TexPerv image linked to the upload of the TexPerv image linked to an IP address that was associated with Mr. Glenn's name? Yes, Your Honor. Okay. Well, you've reserved time for rebuttal. All right. Thank you, Your Honor. All right. Good morning. Ma'am, this is the court. Emily Falconer for the government. You want to explain the DFRAG? Yes, Your Honor. The DFRAG was part of the Windows updates. The Windows updates, in order to have those happen, part of that was this DFRAG process. Now, it's important to note from the record that we don't know how much of that DFRAG process actually happened. Both experts testified to this, both the government's expert and the defense expert. The government's expert explained that when the computer booted up, it began to boot up, he immediately shut it off. Okay? So this was just an inadvertent reboot as he's trying to make an image of this device. We do not know, and the defense expert was not able to explain how much of this DFRAG happened. In addition, we have testimony, undisputed testimony, from both experts that the DFRAG process, and indeed all of these Windows updates, would not have affected what files were in the thumbcast. I'd like to think that when Windows updates on my computer, it doesn't just add a bunch of child porn to it. Is that a fair assumption that I'm making? Because otherwise I might need to not use a computer anymore. Also agreeing that Windows updates do not contain child pornography. That's the case. Microsoft has a lot more problems than antitrust. Sorry. Please go on. Yes, correct. Microsoft has a lot of problems across the board if they're about the argument that the thumbcache not being in the unallocated, the stuff that's in the thumbcache not being in the unallocated proves that the FBI planted the evidence. Because to me, that's, all of this does not matter unless it shows that the FBI planted the evidence. And that's huge. Correct, Your Honor. And this is the first I'm hearing about I don't think that's fairly what his brief said. There's no evidence that the FBI put that pornography on his computer. It was in the thumbcache. I'm not sure that the evidence, the trial evidence also doesn't clearly show that those images that were in the thumbcache were not in the unallocated space. In fact, on cross-examination, his expert was asked, did you review the superseding indictment? Do you know exactly what images we're talking about? And he said, no, I never reviewed the superseding indictment. I don't know what, I mean, he didn't even know what images we were looking at. He didn't search for them. And he couldn't have. He didn't know what they were. He didn't go into the unallocated space to try to find those images. Moreover, he never gave a clear, he never gave a convincing explanation of how those images, let's, even if we spot that those were not in the unallocated space. Now, there is an alternative answer for that. If it's true that they were in the unallocated space, that would mean that at some point he had, he could be, the thumbcache could be something that, those are images that you could have just clicked on, you know, on a website and not downloaded. That would go into your thumbcache, but those files would not be saved on your computer. So that's the simplest explanation, kind of Occam's razor for why that might have been the case. Although we don't agree that the evidence even establishes that they were in fact in one place and not in the other because he didn't search for them. But I'm also concerned, you know, he, they, Mr. Glenn moved to dismiss before the trial. So the stuff that was known then, I think, had an opportunity to address at trial. But he says they didn't know about this defrag until the middle of trial. And so that's the Brady argument as I understand it. I'm sure he'll correct me if I missed it. What is your response to that? That's incorrect, Your Honor. The record flatly contradicts that assertion. I tried, he mentioned at the end of his argument, I tried to quickly go back to the record. I cannot remember if it was referenced specifically in his motion to dismiss. It was a lengthy written motion to dismiss that was briefed by both sides. His expert testified about the defrag. I don't know how he would have found out about that in the middle of trial because that testimony came from his own expert's testimony. It wasn't like something he heard from a government witness. So maybe it was news to the lawyer, but not to the lawyer's team. Correct. I mean, he, I, I doubt also, again, I, I would, did not have a chance to go pull that, that portion of the record back up, but I strongly believe that that will be contradicted by the record. Additionally, Your Honor, his computer scientist was provided the image of the hard drive, which contained, we have lots of testimony about what a Windows registry is, what the computer's registry is. The registry lists every process that happens on a computer, okay, every time it's powered up, every time something's open, every program that is run. The defrag, all of the Windows updates would certainly have been a part of that registry. And his expert testified he had the registry, he reviewed the registry. So I do not think the record supports the conclusion that they found out in the middle of the trial about the defrag. And at any rate, there's ample testimony that the defrag process would not have affected, would not have affected what was in the femcache. So what you have is you have evidence in the femcache. And so, so a lot of what he's talking about here also goes not to the question of suppressed evidence, to Brady, to Youngblood, to bad faith, to spoliation. A lot of what he's talking about here are just simple jury questions, right? So whether, whether, you know, he's, you know, at some point is making essentially a sufficiency argument here, saying, well, just having it be in the femcache, that's not enough to prove that he accessed those images. Well, that's a jury, I mean, that's a question of sufficiency of the evidence. The jury clearly felt that it was enough to indicate that he accessed them. With respect, we've been talking about the femcache images. With respect to the chat step upload image in count one, can you tell us the evidence that links that image to Mr. Glynn that is sort of separate and apart from any issues about the update or defrag or anything like that? Yes. Yes, there is ample evidence, Your Honor, that that image I believe was not actually in the femcache. It was found in an allocated space of his computer. It was there. It was a deleted file on his computer, which, by the way, had no metadata. So most of his argument in his brief is not about the government planting evidence, but it's about metadata being missing that might have shown that someone else was the one that accessed those. Now, the chat step image was found in the unallocated space. It did not contain metadata. We have ample evidence. We have his confession, which, as Judge Haynes said, will the jury consider that to be a true confession or not? That's a question for the jury. He signed the back of the image when the agents were talking to him. He made comments to the effect of, I must have looked at it. I must have had it on my computer if I uploaded it. He admitted that he used chat step under the username textperv, which was the user that undisputedly uploaded that image. It was done from his AT&T account. It's not your typical innocent name, textperv. No. Not a... No. And it was kind of the way he... The agent recounts this, and you have it on tape, too. It's a text, Texas something, Texas pervert, maybe. I mean, he knew that it was his. Did he try to suggest... We also have his chat room activity that backs up the idea that he was on chat step, trading child pornography. He admitted that it was, quote, an I show you, you show me type of situation. Did he suggest that someone else put the chat step image on his computer? No. He never... Not at trial, there was no evidence to that effect. And, in fact, the opposite is true. You have the FBI agents testifying that the only other person who lived with him in his house was his boyfriend. They went to his boyfriend's place of work and confirmed that he was, in fact, at work at the time of that upload. So there's really no good evidence that any of these data overwrites, any of these data overwrites, whatever they were, and that was disputed between the experts' testimony, would have in any way been exculpatory as to these five images, let alone the 2,000 total images that were found on his computer. But, at any rate, what this comes down to, legally, on appeal, is an issue of bad faith, an issue of Judge Garvey's finding that there was no bad faith on the part of the government's computer scientists here. Now, we don't know what the evidence is, so automatically it cannot be a Brady claim. This Court said as much and more that if we don't know, if the exculpatory value of the material is not clear in advance, that's not Brady. That's why Youngblood exists. The Youngblood claims are for claims of failure to preserve. Well, did Judge Garvey make a finding that Lehman, the computer analyst, did not act in bad faith? I'm sorry, can you repeat the question? No, sure. Did Judge Garvey make a finding, to which we would have to defer, of course, that Mr. Lehman didn't act in bad faith by allowing the updates to run? Yes, Your Honor, the findings were implicit. I mean, this issue was extensively briefed by both sides. So Judge Garvey had in front of him briefings saying, you know, here's a Youngblood claim, here's the elements, here's bad faith, you know, the government's response, here's why it wasn't bad faith. And Judge Garvey carried that motion with the case and said, I'm going to hear the testimony of both experts before I rule on that, and then denied the motion to dismiss after that. So, yes, it was certainly an implicit finding of no bad faith because he was well aware, we know from the briefing, of what the standard was. There was extensive testimony about whether or not Lehman was acting in bad faith. Mountains of evidence that he was not acting in bad faith. In fact, one that we don't discuss in our brief, but that's not directly relevant to Lehman, but is telling, is that we have Ingram, the defense expert, saying in his testimony, this has happened to me before. One time, when I was doing a forensic process on a computer, it crashed and rebooted. It's something that happened. I think this is page 941. I don't know if I want to use the word authority, but where would we be able to suddenly be making fact findings about Mr. Lehman's good or bad faith? I mean, we can review what the district court did, but I'm unaware of us just saying, oh, well, he was in bad faith. Isn't that quintessentially what a trial judge does, make those kinds of determinations? So, yes, no. I mean, correct, Your Honor, and he did. I mean, he did make that finding. I mean, I think it sounds like if there's a question of, you know, defense counsel said in his argument, oh, well, there's nothing to review. He didn't make any findings whatsoever. That's not correct. His findings were implicit. What the court can do, I mean, so in order, by denying a young blood claim, he's implicitly making a finding of no bad faith. By denying a spoliation instruction, adverse inference instruction, that's implicitly a finding of no bad faith. Now, what this court can do is look at the record and say, was that finding plausible in light of the record as a whole? Was it supported by the evidence? And our brief... Right, and we can't just start over and say, well, we think it's bad faith. We have to look at whether the district court could have come out the way it did. No, exactly, Your Honor. It's not a question of would anyone else sitting in that district court's shoes have made a different finding. The question is, was that finding plausible in light of all of the evidence that was presented? In addition, the district court's ability to sit and observe the testimony of those two witnesses. This was ultimately came down to a battle of testimony between two expert witnesses. And that judge, as a fact finder, was able to observe their testimony, observe their demeanor... And so was the jury. Jury also? As well as the jury, absolutely, absolutely. So no, I mean, what Defense Counsel is essentially requesting is for this court to step in and substitute its judgment as a fact finder for the district court's, which is certainly not what happens under the standard review for any of these claims. Now, that goes also for the Franks issue, on the motion to extensive findings on that claim. There was a Franks hearing. I mean, at trial, oftentimes, you know, what we see is that he was just disposing of a number of motions, and he did not sit down and make the same kind of ruling from the bench while the jury is waiting in the other room as opposed to... And no one asked him to. No one said, Judge, I'm sorry, but you just overruled my motion. Are you saying there's a lack of bad faith? That's the time to bring up any deficiencies in the district court's explanation is when the district court is ruling, not tell the appeals court, let's go tattle on the district court not being thorough enough. Correct, Your Honor. And it was perfectly, the issues were well presented to the judge. There was extensive briefing on those motions. Well, and Judge Godbee is not shy. If he needs more information, he'll ask for it. Correct. And in the issue of the motion to suppress, he did feel the need of more information. He called a hearing. He heard extensive testimony from Special Agent Mulligan. He personally questioned her himself. He wasn't satisfied with the attorney's questions. He personally turned to her and asked her questions about... In what you'll agree was very leading fashion, his asking of those questions. What did he do when he asked those questions? When he asked Agent Mulligan the questions, he asked a lot of leading questions. He did. He did ask, I mean, he asked leading questions. That is true. I mean, but they were also getting to the ultimate determination that he had to make. Is she telling the truth? You know, does she, what does she see, what does she believe is the standard of care that, you know, she's owed? We also have extensive objective evidence, just actual evidence that she was not acting in bad faith here, both from, you know, her testimony, and in addition, the fact that we don't... The address where the upload, and this is another thing that Judge Godbee ultimately concluded, was that the address of that upload was not relevant to the question of what would likely be found. Well, and both addresses were connected to Mr. Glenn, right? Correct. Because when I read the appellant's brief, I thought, oh my God, this is some random address and they're attributing it to Mr. Glenn. This is terrible. And then I realized, oh no, I mean, it was his address, it's just at a different time. Oh, that's a little different feel to it than I got from the brief. Correct, Your Honor. The AT&T account was linked to both addresses, very clearly. The IP address was very clearly linked to both addresses. So ultimately... Well, he had just lived in one place and then moved. Isn't that what had happened? He was in one place, correct. He lived in one place on, you know, on August 1st, the date of upload, by the date of the search he had moved. The authorities did not even get the tip from the National Center for Missing and Exploited Children until some 30 days after that. So that's different from just some random address I never heard of being attributed to me and nobody saying that that's where it was uploaded. That would be different from I moved from place A to place B, which is what happened here. Correct. And also, I mean, this is a computer crime. This is a child pornography crime. This isn't a murder, okay, where the murder allegedly happened on West Forest Drive and then he moved to Roost Street and they got a warrant to search Roost Street. There's reason to think that there would not be evidence at Roost Street of a murder that happened on West Forest Drive. Child pornography, the crime, travels with him and his computer and his belongings and his internet account. Of course, we don't even really get to that question without the bad faith question. So on Frank's, you know, the first question is, was there a misstatement? Yes, there was a misstatement about what the record said. Was that misstatement made intentionally, recklessly, or recklessly? Judge Gabby found explicitly that it was neither of those things and indeed that it was not even negligent and indeed that it was a mistake that he, in fact, could have made. But so if the court believes that that finding is clearly erroneous, then it gets to the question of, but was there still probable cause? But was there probable cause in any event? And certainly there was because this is a crime. Why would we believe that he would have moved to a new address and left that computer in an empty house for someone else to find? Of course, we knew that he lived in place B, that, you know, his account was linked to both places, so that's adequately established. But again, bad faith controls that issue as well. And any of the live issues on appeal is really a question of finding the fact that were made by the district court, whether those were clearly erroneous. So I had just one more thing I wanted to address, which is the disclosures. Whether somehow there was some impropriety in what the government disclosed, and whether those have any bearing on the legal issues in this case. Now, because that really, if you read the testimony, the entire testimony of Brian Ingram, the defense's expert, he did not, he never suggested that the government planted evidence. He never suggested any of these things. His problem essentially was with a record-keeping issue. There's a lot of really arcane testimony about master file tables and SAM hives, registry hives, and things like that. But when it comes down to it, his problem was with record-keeping and disclosure. This was his first federal case. He had no knowledge of FBI procedures. There was extensive testimony about what an FBI 302 report does or does not need to contain. It's a high-level summary of a process. It does not have to be redundant with other disclosures. In this case, every single aspect, every single complaint about the data issues was disclosed in the registry. And so the only issue then was, with timeliness, was he felt that he should have received that 302 report sooner than he did. He still received it four months before trial. He still attached it as an exhibit to his motion to dismiss. It was still used extensively to impeach Lehman, an attempt to impeach Lehman at trial. So there's no—the government disputes that there was anything faulty about the disclosure process in general other than just the report not having been prepared contemporaneously. And two, the government would just reinforce that that has no bearing on the issue, on the legal issues, of whether anyone did anything in bad faith, so as to give rise to due process, so as to render it an abuse of So for those reasons, the government would ask for it to affirm. Okay. Thank you. Mr. Saputo, your rebuttal. Your Honor, the government is honestly playing fast and loose with the facts here. She said she was—the government said it was confident that the defrag was in my motion to dismiss and that the record would show that this was disclosed. Well, in the record at 958, our expert says this is the first time anyone is talking about defrag. It was not in my motion to dismiss. But your expert is the one who found it. So how can that be a— That's not correct, Your Honor. And this is why I encourage you to go back and read the record and not rely on the government, because clearly the government is playing fast and loose here. It was the government's witness on direct that talked about defrag. That's how we find out during trial, which is why I'm asking for a new trial. This is what's—the fact that this was trial theory. Of course, that's why we didn't—we couldn't accuse the FBI of planning evidence until we found out about this defrag issue. And the government's argument that it's—that this was contained in the registry is not a disclosure. If I hand you a bloody rag, that is not a disclosure that the DNA doesn't match. It's not a disclosure that there's an anomaly. It's— What does defrag do? Defrag rearranges information on a computer's hard drive. And in the process, it overwrites everything that's underneath it. And it also alters the master file table. The master file table is that list of files that says when— What is your theory? That the FBI planted the evidence and then did the defrag to cover that up? That's your theory? That's correct, Your Honor. And what evidence do you have of that? We have the fact that—and I pointed this out on the record earlier—that there was a disk that was inserted into the computer that no one talked about. It was another thing that was not disclosed. We have their bad faith. And speaking of bad faith, where's the bad faith found? It's found in the lack of disclosure. If this wasn't such a big deal, then why wasn't it disclosed? It wasn't disclosed because it was a big deal and there was— I don't think something's a big deal. I might not mention it. I mean, something could be so irrelevant, it doesn't occur to me to mention it. And something could be so incredibly relevant that I don't mention it. And that's the problem, is which one is it? Because you're asking for a new trial. And if you look at the record, Your Honor, it's clear that even the government's witness admitted this is a big deal. I asked him. Where should I look for that? Didn't bring my computer, but this is in my cross. I asked him about the master file table being altered. He admitted the master file table had been altered. It's in the record. But your expert is named Ingram, right? That's correct. Did your expert, Ingram, testify that DFRAG would not have affected images in the thumb cache? He did testify to that, Your Honor. And the reason why that is not a critical issue here is that the DFRAG doesn't just—it's not that it changes files in the thumb cache. It's that it gives us information about how something could end up in the thumb cache without it being anywhere else. Because the thumb cache can't create an image unless it was on the computer. So the only way for an image to get into the thumb cache without it being on the defendant's computer is if the FBI put it there. Where does your expert say that? Our expert didn't say that because we didn't know anything about the DFRAG, which is why we need a new trial. Where is that anywhere in the record? Where is what exactly, Your Honor? The point that you just made, that it's not anywhere in the unallocated space, but it's on the thumb cache, which means it's planted, which is a huge accusation. Where is there in the evidence that I can look somebody saying that besides you? Your Honor, what you're asking me about is an argument. I never made that argument because I did not know about the DFRAG. No. I'm not asking you about an argument, although that matters. You find out in the middle of trial about this DFRAG. That's correct. You're now telling me that that is evidence that the FBI planted it. That's correct. I'm not a computer expert. How do I know that? Where in the record can I find someone saying this proves a plant? You can find, you can, of course, the record doesn't say this proves a plant because I didn't have that information. The record wouldn't say it. You had that information in the middle of trial. You have an expert sitting there. It's now been two years since the trial. Where is the affidavit? Where is the motion for new trial? Where is the whatever that says this? Your Honor, it says it in the government's brief. The government's brief itself. The government's brief says that the FBI planted the evidence? Your Honor, if I may. I missed that. If I may, I'd like to respond, Your Honor. Okay. The government's brief says that all of the images in, from count two through nine are found in the thumb cache. And it says in count one that the single image in count one is found in unallocated file space. There is nothing anywhere in the record that says that count one, that the image in count one was found in the thumb cache. And there is nothing in the record that says all of the images. That isn't my question. My question is, let's assume that's true. Something's in the thumb cache. Something's not in the, but it's not in the unallocated space. Where in the record does it tell me that means it was a plant? The effect of that fact being the plant? I need expert information on that. Where is it? What the expert information says in the evidence, at trial, is that the master file table is what would tell you how an image got into a particular place. And the government's expert testified that the master file table was altered. And this is why that's important, because... By the Windows update. No, well, by the defrag process. Yes, the Windows update didn't... We're not saying the Windows update put child porn on the computer. We're saying the Windows update through the defrag process caused the master file table to be altered, which is quite a coincidental fact, because the master file table is the only thing... Let me come at it another way. If the FBI planted evidence, this is a very serious matter, not just for Mr. Glenn, although obviously important for Mr. Glenn, somebody needs to be prosecuted for that, because that itself would be a crime. So for that big of a headline issue, if you will, to be a basis for you to win this appeal, I need something more than your argument here that you're bringing up somewhat at the last minute. And where is that? That's what I'm asking. That is why we need a new trial, Your Honor, so that we can get into... No, that is why you need that to be somewhere in the record. I mean, I've seen people come up with affidavits after the fact, file motions, even ask the appeal for supplemental evidence, whatever. I don't see that anywhere here. So I don't know anything of what you're saying being supported. I'm not saying you're making it up. I'm sure you believe it. But I need an expert, not a lawyer, to tell me this. And where would I find that? And you're saying nowhere. I'm saying that the master file table was altered. And I'm saying that that is in the record that it had been altered. The government let it happen and was not disclosed. And that is Brady. That is Brady material that was not disclosed to us. And we need a new trial because of that. This was favorable evidence. The fact that a master file table was altered should have been disclosed, whether it was a form of 302 or an email, should have said, hey, the master file table was altered. I think you've answered. Thank you. All right. Thank you. Appreciate your argument. The case is under submission, and we will take a five-minute break.